Eric E. Huber
Colo. Bar No. 40664
Sierra Club
1650 38th St. Ste. 102W
Boulder, CO 80301
(303) 449-5595

Timothy M. Bechtold
Mont. Bar No. 4376
Bechtold Law Firm, PLLC
317 East Spruce Street
PO Box 7051
Missoula, Montana 59807
Tel: (406) 721-1435

Rebecca K. Smith
Mont. Bar No. 9658
PUBLIC INTEREST DEFENSE CENTER, P.C.
P.O. Box 7584
Missoula, MT 59807
Tel: (406) 531-8133

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| ALLIANCE FOR WILD ROCKIES, NATIVE ECOSYSTEMS COUNCIL, CENTER FOR NATIVE ECOSYSTEMS, AND SIERRA CLUB, INC., ) <br> Plaintiffs ) <br> v. ) <br> ) <br> JANE LYDER, in her official capacity as Assistant Deputy Secretary of the Department of Interior, et. al., ) <br> Defendants. ) | No. CV 09-73-M-DWM <br><br> PLAINTIFFS' MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT |

# TABLE OF CONTENTS

Table of Authorities…………………………………………………………………iii

INTRODUCTION…………………………………………...…………………………..1

FACTS…………………………………………………………..…………......……..2

    A.  DESCRIPTION OF THE CANADA LYNX
        AND ITS HABITAT…………………………………………...….……...2

    B.  THE CRITICAL HABITAT DESIGNATION FOR
        THE CANADA LYNX…………………………………………………3

STANDARD OF REVIEW……………………………………………….........5

ARGUMENT……………………………………………………………………6

    A.  THE FWS FAILED TO BASE THE CRITICAL HABITAT
        DESIGNATION ON THE BEST SCIENTIFIC DATA
        AVAILABLE ON CLIMATE CHANGE……………………….............6

        1.  The Best Available Scientific Data in the
            Administrative  Record………………………………………….6

        2.  The FWS Unlawfully Delayed Decision on the Climate
            Change Information to its 5 year Listing Review………….…....9

        3.  The FWS Failed to Designate Critical Habitat based on
            the Climate Change Information……………………………..10

    B.  THE FWS APPLIED UNLAWFUL AND ARBITRARY
        CRITERIA TO IDENTIFY CRITICAL HABITAT ……………………12

        1.  Requiring Evidence of Reproduction is Contrary to the
            Plain Language of the ESA…………………………………….....12

        2.  The FWS's Standard was Contrary to its Prior and Current
            Occupancy Standards…………………………………………..14

3.  The FWS Applied an Unlawful "Self-sustaining" Standard
to the Southern Rockies……………………….……………...16

C.  THE FWS FAILED TO INCLUDE ALL OCCUPIED
CRITICAL HABITAT REQUIRED BY ESA § 3(5)(A)(i)…………...…17

1.  Excluded Areas of Montana……………............................................18

2.  Excluded Areas of Idaho……………………………………….20

3.  Exclusion of all Lynx Habitat in Colorado…………………………21

D.  THE FWS's EXCLUSION OF ANY AND ALL "UNOCCUPIED"
HABITAT DID NOT COMPLY WITH ESA § 3(5)(A)(ii).....................24

E.  THE FWS DID NOT APPLY THE BEST AVAILABLE
SCIENTIFIC DATA AND WRONGFULLY EXCLUDED DATA…….28

CONCLUSION…………………………………………………………...........29

Certificate of Compliance

Certificate of Service

## TABLE OF AUTHORITIES

**Cases**

*Cape Hatteras Access Preservation Alliance v. DOI,*
344 F.Supp.2d 108, 123-24 (D.D.C. 2004)……………………...……………..24

*Center for Biological Diversity v. Norton,*
240 F.Supp.2d 1090, 1099 (D. Ariz. 2003)………………………………………24

*Chevron USA v. Natural Res. Def. Council,* 467 U.S. 837, 843 (1984)…………..14

*Defenders of Wildlife v. Norton,* 239 F.Supp.2d 9, 26 (D.D.C. 2002)
vacated in part, 89 Fed. Appx. 273 (D.C. Cir. 2003)…………………….....……...3

*Marmolejo-Campos v. Holder,* 558 F.3d 903, 919 (9th Cir. 2009)………………16

*Motor Vehicle Mfrs. Assn. of U.S. v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29, 43 (1983)……………………………………………………6, 12

*Natl. Wildlife Federation v. Natl. Marine Fisheries Service,*
524 F.3d 917, 932 (9th Cir. 2008)………………………………………………...16

*Native Ecosystems Council v. Dombeck,* 304 F.3d 886, 891 (9th Cir. 2002)………5

*Natural Resources Defense Council, Inc. v. Evans,*
279 F.Supp.2d 1129, 1153 (N.D. Calif. 2003)………………………………14

*NRDC v. EPA,* 526 F.3d 591, 607 (9th Cir. 2008)………………………………..16

*Ocean Advocates v. U.S. Army Corps of Engrs.,*
361 F.3d 1108, 1119 (9th Cir. 2004)………………………………………...6, 12

*Regents of Univ. of Cal. v. Shalala*, 82 F.3d 291, 294 (9th Cir. 1996)……………16

*Robinson v. Shell Oil Co.,* 519 U.S. 337, 340 (1997)…………………………..14

*Sierra Club v. Leavitt,* 488 F.3d 904, 913-14 (11th Cir. 2007)…………………...29

*Southwest Center for Biological Diversity v. U.S. Forest Service,*

100 F.3d 1443, 1450 (9th Cir. 1996)……………………………………………...15


**Statutes**

ESA § 3 (5)(A)(i)………………………………………………………1, 17, 25

ESA § 3 (5)(A)(ii)……………………………………………….....1, 24, 26, 28

ESA § 4 (b)(1)(B)(2)…………………………………………..…………..1

ESA § 7……………………………………………………………...15, 23

16 U.S.C. §1531……………………………………………………………1

16 U.S.C. §1532(5)(A)(i)…………………………………….12, 18, 21, 25

16 U.S.C. §1532(5)(A)(ii)……………………………………………...24

16 U.S.C. §1533(b)(1)(B)(2)…………………………………………...28

16 U.S.C. §1533(b)(2)……………………………………………………...9

16 U.S.C. §1533(b)(6)(C)……………………………………………...3

16 U.S.C. §1533(b)(6)(C)(ii)……………………………………………9

16 U.S.C. §1533(f)……………………………………………………7

16 U.S.C. §1536(a)(2)……………………………………………………15

5 U.S.C. §706(2)……………………………………………………………1

5 U.S.C. §706(2)(A)……………………………………………………..5

**Federal Register and Regulations**

50 CFR §424.21………...……………………….…………………….....10

65 FR 16052…………….....…………………………….…………2, 3, 22

65 FR 16059…………………………………………………………22

68 FR 40076…………………………………………………………..7

68 FR 40083…………………………………………………………..7

71 FR 66007………………………………………………………..3

72 FR 19549…………………………………………………………10

73 FR 10860…………………………………………………….4, 12

73 FR 10869…………………………………………………...12-13

73 FR 76990…………………………………………………….27

74 FR 8611…………………………………………………...…9

74 FR 8616………………………………………………2, 4, 13, 20

74 FR 8617………………………………………………10, 11

74 FR 8618………………………………………………………3

74 FR 8619……………………………………………………..17

74 FR 8621………………………………………………3, 10

74 FR 8626………………………………………………17, 25

74 FR 8635………………………………………………………4

74 FR 8638………………………………………………5, 18

74 FR 8641…………………………………………………………………..17

74 FR 8642…………………………………………………………………5

74 FR 8643…………………………………………………………....20

74 FR 8661……………………………………………………………5

74 FR 8662………………………………………………………..8, 20

74 FR 8687………………………………………………8, 18, 20

## INTRODUCTION

Pursuant to Fed. R. Civ. P. 56, Plaintiffs Alliance for Wild Rockies *et. al.* request summary judgment in their favor and against Defendants. The revised critical habitat designation for the Canada lynx issued by the U.S. Fish and Wildlife Service (FWS) on February 25, 2009 (hereafter "the Final Rule") does not meet the requirements of the Endangered Species Act (ESA), 16 U.S.C. §1531 *et. seq.*, or the Administrative Procedure Act (APA), 5 U.S.C. §706(2), because the critical habitat designation:

1) was not based on the scientific data in the Administrative Record on the impacts of climate change;

2) was based on unduly restrictive criteria for including an area in critical habitat;

3) did not include all necessary occupied habitat as required by ESA §3(5)(A)(i);

4) did not include any unoccupied habitat as required by ESA §3(5)(A)(ii); and

5) was not based on the best scientific data available and excluded data contrary to ESA §4(b)(1)(B)(2).

## FACTS

Pursuant to L.R. 56.1 Plaintiffs have filed a *Statement of Undisputed Facts* and incorporate that herein. Plaintiffs provide a brief summary below for background purposes.

### A.   Description of the Canada lynx and its Habitat

*Lynx canadensis,* the Canada lynx ("lynx"), is a medium-sized wild cat comparable to the bobcat in size.  The lynx is distinguishable from similar-sized cats by its long legs and large paws, which both make it well-adapted to hunting in deep snow, and its tufts of dark hair on the ears.  The Canada lynx is highly dependent on snow-covered areas due to its highly specialized predator-prey relationship with the snowshoe hare – a species evolved to survive in areas that receive deep snow. 74 FR 8616.

The Canada lynx historically roamed throughout the boreal forests of North America, including Alaska, Canada and throughout much of the contiguous United States. 65 FR 16052. Throughout the 1900s, lynx populations declined in the United States due to trapping for fur and loss of habitat from forest clear-cutting and associated road building, and large-scale development.  (Complaint ¶26; Answer ¶26).

Only approximately 1,000 lynx remain in the contiguous United States, which is considered to be the southern portion of its range. Most of the remaining

lynx in the lower 48 states live in forested and high elevation snow-capped areas in Montana, Washington, Idaho, Colorado and Wyoming. 74 FR 8621; Administrative Record (AR) L-3327-28. [1]

### B. The Critical Habitat Designation for the Canada Lynx

The FWS's listing and critical habitat designation for the lynx is the result of over a decade of litigation. Pertinent to this case, the FWS listed the contiguous United States Distinct Population Segment ("DPS") of the lynx as "threatened" on March 24, 2000. 65 FR 16052.  However, the FWS failed to propose critical habitat concurrently with the listing or within one year, as required by the ESA, 16 U.S.C. § 1533(b)(6)(C).  As a result it was ordered to "undertake prompt rulemaking" to designate critical habitat for lynx. *Defenders of Wildlife v. Norton, 239 F.Supp.2d 9, 26 (D.D.C. 2002)*.

In 2006, the FWS finally designated critical habitat for the lynx, but limited it to 1,841 square miles in Minnesota, Montana, and Washington. 71 FR 66007 (Nov. 9, 2006). The FWS later acknowledged that designation was unsupported and withdrew it. 74 FR 8618.

---

[1] The Administrative Record submitted by FWS on CD-ROM consists of 14 volumes labeled A through L. Cites herein are to the volume and page number.

On January 15, 2008, the D.C. district court again ordered the FWS to establish critical habitat for the lynx. *Defenders of Wildlife v. Kempthorne*, nos. 00-2996, 04-1230 (D.D.C. Jan. 15, 2008) (Exhibit I hereto).

On February 28, 2008 the FWS proposed its revised critical habitat designation. 73 FR 10860. Following public comments, the FWS issued the final revised critical habitat for the lynx (the "Final Rule") on February 25, 2009. 74 FR 8616.

In the Final Rule, the FWS defined the "essential biological or physical features" for the lynx's critical habitat in terms of "primary constituent elements" (PCEs). 74 FR 8635. These PCEs are:

1. Boreal forest landscapes supporting a mosaic of differing successional forest stages and containing:

a. Presence of snowshoe hares and their preferred habitat conditions, which include dense understories of young trees, shrubs or overhanging boughs that protrude above the snow, and mature multistoried stands with conifer boughs touching the snow surface;

b. Winter snow conditions that are generally deep and fluffy for extended periods of time;

c. Sites for denning that have abundant coarse woody debris, such as downed trees and root wads; and

d. Matrix habitat (e.g., hardwood forest, dry forest, non-forest, or other habitat types that do not support snowshoe hares) that occurs between patches of boreal forest in close juxtaposition (at the scale of a lynx home range) such that lynx are likely to travel through such habitat while accessing patches of boreal forest within a home range.

74 FR 8638.

In the Final Rule, the FWS designated approximately 39,000 square miles of critical habitat in Maine, Minnesota, Montana, Wyoming, Idaho, and Washington. 74 FR 8642. A map of the final critical habitat designation is at 74 FR 8661.

However, as set forth below, the FWS excluded many large areas from the Final Rule. For example, it excluded areas adjacent to the current designation in the Northern Rockies, particularly Montana and Idaho, which are occupied by lynx and share the same primary constituent elements as the designated areas. The FWS also excluded all habitat in the Southern Rockies, particularly all occupied lynx habitat in Colorado. And, the FWS did not include *any* unoccupied habitat in the critical habitat designation. As a result, it excluded areas which provide essential connectivity between lynx populations and it omitted habitat necessary to account for the loss of lynx habitat due to climate change.

## STANDARD OF REVIEW

Judicial review of an agency's compliance with the ESA is governed by the APA. *Native Ecosystems Council v. Dombeck,* 304 F.3d 886, 891 (9th Cir. 2002). Agency decisions "shall" be "set aside" under the APA if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A). Agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to

consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Assn. of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The court must ask "whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment . . . [The court] also must determine whether the [agency] articulated a rational connection between the facts found and the choice made. [The] review must not rubber-stamp . . . administrative decisions that [the court deems] inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *Ocean Advocates v. U.S. Army Corps of Engrs.*, 361 F.3d 1108, 1119 (9th Cir. 2004) (internal citations and quotations omitted).

## ARGUMENT

## A.   THE FWS FAILED TO BASE THE CRITICAL HABITAT DESIGNATION ON THE BEST SCIENTIFIC DATA AVAILABLE ON CLIMATE CHANGE

### 1.   *The Best Available Scientific Data in the Administrative Record*

According to the Intergovernmental Panel on Climate Change (IPCC), the term "climate change" refers to "any change in climate over time, whether due to natural variability or as a result of human activity." AR B-785 n.1. For a full

description of climate change and global warming and how this causes a loss of lynx habitat, *see Plaintiffs' Statement of Undisputed Facts.*

To summarize, the dependence of Canada lynx on winter snow and boreal forest renders it especially vulnerable to climate change. (Complaint ¶44; Answer ¶44). Evidence of the adverse impacts of climate change upon lynx habitat has been before the FWS since at least 2003. *See,* 68 FR 40076. At that time, public comments notified the agency that climate change posed a threat to lynx populations. *Id.* at 40083. This was based on a study (Hoving 2001) that found that a warming climate could directly affect lynx habitat, due to a reduced snowpack and resulting loss of predatory advantage, and indirectly by affecting the species composition of forests. AR B-3873–74, 3918–21. Nonetheless, the FWS concluded that "the potential for long-term reductions in snow depth because of climate change is speculative at this time and is not a threat to lynx within the foreseeable future." 68 FR 40083.

Approximately two years later, the FWS conceded that climate change was not speculative and that it would have adverse impacts on lynx habitat. *See* FWS's Lynx Recovery Outline, AR B-3670 (at 11). [2]

In the Final Rule, the FWS acknowledged the Hoving study and

---

[2] Although the ESA requires a Recovery Plan for listed species, 16 U.S.C. §1533(f), the FWS has not developed one for the lynx. The Lynx Recovery Outline serves as an interim strategy to guide recovery efforts and inform the critical habitat designation.

identified three other scientific reports on the adverse impacts of climate change on the lynx.  74 FR 8617.

The first of those is the Gonzalez report, which was prepared by a scientist with the Nature Conservancy in conjunction with several scientists from the U.S. Forest Service.  AR B-514.  It identifies the loss of lynx habitat that will occur as a result of climate change through the year 2100 and demonstrates that it will be severely reduced from its current distribution.  It indicates that portions of Montana and the high elevations of Colorado in particular retain snowpack better than any other lynx habitat, hence they will be among the areas remaining after habitat is lost over time. AR B-514–21.  Comparing the FWS's maps of designated critical habitat (74 FR 8662, 8687) to the projected future habitat in the Gonzalez report (AR B-514–21),  it is evident that there are large areas of lynx habitat and linkages that FWS did not include in the critical habitat designation. The Gonzalez report also  finds that "intensive management" of lynx habitat is necessary to address this loss of habitat. AR B-517.

The second report referenced by the FWS, by Knowles, *et. al.,* is a scientific study on the trends in snowfall versus rainfall in the Western United States due to climate change. It concludes that there is: 1) more precipitation falling as rain instead of snow; and 2) earlier snowmelt. AR B-961,973.  Since one of the characteristics of lynx habitat is that it must be snow-covered four months of the

year, AR B-520, the Knowles study supports the conclusion that some areas that currently provide lynx habitat will not do so as the climate warms.

The third report referenced by the FWS is by Danby and Hik; a scientific study on the rapid change in recent subarctic alpine tree line dynamics due to climate change. It concludes that impacts in mountainous areas are expected to be marked, as "tree line" will undergo a significant change in structure and shift upward in altitude and north in latitude. AR B-479–89.   Because lynx depend on boreal forests, lynx habitat will be affected by this shift.

### 2. *The FWS Unlawfully Delayed Decision on the Climate Change Information to its 5 year Listing Review*

The ESA requires the FWS to base its determination on "best scientific data *available*" in designating critical habitat. 16 U.S.C. §1533(b)(2)(emphasis added); and 16 U.S.C. §1533(b)(6)(C)(ii), which directs the Secretary to base the final rule "on such data as may be available at that time." The FWS acknowledged that it was required to base the designation on the data "at the time we finalize the designation." 74 FR 8621.

Nonetheless, the FWS stated in the Final Rule: "This information [Gonzalez, Knowles, Danby and Hik], combined with the information in Hoving 2001, still needs to be evaluated further to determine how climate change might affect lynx

and lynx habitat. We are evaluating this information *in the 5-year review* we are conducting for lynx." 74 FR 8617 (emphasis added).

 The FWS's 5-year review is no substitute for making the critical habitat designation required under the ESA.  The 5 year review is required under the FWS's regulations as a "Periodic Review." 50 CFR 424.21.  The regulation states: "At least once every 5 years, the Secretary shall conduct a review of each listed species to determine whether it should be delisted or reclassified." *Id.* In this case, the 5-year review for the lynx began April 18, 2007, and its purpose is to consider de-listing or re-classifying the species. 72 FR 19549.  Thus, the 5-year review is not subject to the statutory or regulatory procedures governing critical habitat determinations, and considering this information in the 5-year review does not excuse the agency's delay of its final decision on climate change. [3]

### 3.     *The FWS Failed to Designate Critical Habitat based on the Climate Change Information*

Although the FWS "acknowledge[d] that climate change could change the suitability of lynx habitat in the future," it stated in the Final Rule: "At this point in time, reliable projections of future climate in lynx habitat in the contiguous United States are not available." 74 FR 8621. That is contrary to the IPCC report, the

---

[3]  The FWS must consider climate change in designating critical habitat. This duty was affirmed in the September 14, 2009 directive from the Secretary of the Interior to consider climate change in FWS decision making.  See, Exhibit A hereto.

report of Gonzalez *et. al*., and the other climate change reports in the record. The FWS does not explain why these reports are allegedly unreliable.

To the extent that the FWS considered the climate change information, it did so only to a limited and incomplete extent.  Referring to climate change, the FWS stated:

> At this time, we find it appropriate to designate critical habitat for the lynx in areas *occupied* by the species that *currently* contain the physical and biological features essential to the conservation of the lynx. Revisions to the critical habitat designation may be necessary *in the future* to accommodate shifts in the *occupied range* of the lynx. The revised critical habitat units in this rule include higher-elevation habitats that lynx would be able to continue to use *if* lynx distribution or habitat shifted upward in elevation,"

74 FR 8617 (emphasis added).

This passage shows that although the FWS might designate critical habitat *in the future* to account for climate change, it did not base its current designation on those grounds. Only incidentally did it find that some of the habitat it listed for other reasons would serve as a refuge for climate change.

The FWS did not identify the currently designated habitat that will be lost to climate change. Nor did it identify the currently unoccupied habitat that may need protection in the present, so that it will be available for occupancy in the future as habitat is lost and shifts due to climate change.  The FWS compounds this error by stating if and when it makes its future determination, it will still limit the critical habitat designation to "occupied" habitat.

11

Under the APA review, the agency must consider all the relevant factors and articulate a relationship between those factors and the conclusions it reaches. *Ocean Advocates*, 361 F.3d at 1119.  In this case, the agency did not fully consider the climate change information and base its decision on that information.  It acted contrary to the statutory mandate to base its decision on the best scientific data available, and acted contrary to the evidence before the agency and/or overlooked an important aspect of the problem, which renders its Final Rule arbitrary and capricious. *Motor Vehicle Mfrs. Assn.,* 463 U.S. at 43.

**B.   THE FWS APPLIED UNLAWFUL AND ARBITRARY CRITERIA TO IDENTIFY CRITICAL HABITAT**

   **1.   *Requiring Evidence of Reproduction is Contrary to the Plain Language of the ESA***

The first element for determining whether a particular area is critical habitat under the ESA is whether it is "occupied by the species, at the time it is listed." 16 U.S.C. §1532(5)(A)(i).

In this case, the FWS applied a definition of the statutory criteria of "occupied by the species" as requiring verified evidence of occupancy *and* evidence of reproduction since 1995. *See,* Proposed Rule, 73 FR 10860, 73 FR

10869 and Final Rule, 74 FR 8616, 8640.  Plaintiffs objected to this definition and the resulting exclusion of areas. AR A-2346.[4]

The U.S. Forest Service objected to this definition as well. It informed the FWS that it was improper to require evidence of reproduction to consider an area occupied, stating: "evidence of reproduction is difficult to obtain; [and] many survey methods that detect lynx do not produce it." McKelvey, AR L-4644. The Forest Service found that the FWS's standards were "seemingly arbitrary," "inconsistently applied," and "logically weak." *Id*. In another comment letter the Forest Service concluded "throughout the document the definition of critical habitat seems arbitrary . . . Few truly rare species could meet these stringent criteria for assigning critical habitat . . ." Squires, AR L-4649.

Indeed, the FWS's standard is inconsistent with the plain language of the statute.  The ESA uses the phrase "specific areas within the geographical area occupied by the species."  16 U.S.C. §1532(5)(A)(i).  The plain meaning of the word occupy is "to take up (a place or extent in space)."[5] Nowhere do the ESA or the FWS regulations state that the term "occupied" requires verified evidence of breeding animals and reproduction.

---

[4] Plaintiffs' public comments of November 21, 2008 are in the AR index at A-2337 under the name David Gaillard.
[5] See, http://www.merriam-webster.com/dictionary/occupy.

Courts look to the text of the statute to "determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.,* 519 U.S. 337, 340 (1997). If from the plain meaning of the statute congressional intent is clear, that is the end of the matter. *Chevron USA v. Natural Res. Def. Council,* 467 U.S. 837, 843 (1984). Agency interpretations, like the FWS's, which are inconsistent with the plain language of the statute, are entitled to no deference and are arbitrary and capricious. *Id*; and *see, e.g., Natural Resources Defense Council, Inc. v. Evans,* 279 F.Supp.2d 1129, 1153 (N.D. Calif. 2003).

### 2.    *The FWS's Standard was Contrary to its Prior and Current Occupancy Standards*

The standard for "occupancy" the FWS applied in the Final Rule conflicts with the criteria it has used with other agencies from at least 2006 to the present. In their May 2006 Conservation Agreement, the FWS and Forest Service agreed that entire national forests qualify as "occupied" lynx habitat if *either* of two conditions were met: (1) there are at least two verified lynx observations or records since 1999 on the national forest unless they are verified to be transient individuals; *or* (2) there is evidence of lynx reproduction on national forest. AR L-

14

4283. Once a national forest is considered "occupied," it remains occupied indefinitely. *Id.* [6]

The FWS applied that standard in its ESA §7 consultations with the Forest Service throughout the rulemaking period for the lynx critical habitat designation.[7] In July of 2008, the FWS released its Biological Opinion on the Forest Service's Southern Rockies Lynx Amendment, which amended eight National Forest management plans. *See* Exhibit B hereto. The FWS applied the 2006 definition of occupancy and concluded that the seven national forests covered by the Southern Rockies Lynx Amendment qualified as "occupied." *Id.* at 5. [8]

Similarly, in its Biological Opinion for the Forest Service's Northern Rockies Lynx Amendment (Northern Rockies Biological Opinion), released in March of 2007, the FWS applied that definition and concluded that lynx occupied numerous national forests in Montana and Idaho. AR K-54,85.

---

[6] The 2006 definition is inconsistent with the ESA's "best scientific data available" standard as well, since it excludes pre-1999 data.

[7] Under ESA §7(a)(2), the FWS was required to determine that the Forest Service's action "is not likely to . . . result in the destruction or adverse modification of habitat of such species which is determined by the Secretary . . . to be critical." 16 U.S.C. §1536(a)(2).

[8] The Administrative Record is lacking the FWS's Biological Opinion; as well as the Forest Services' Southern Rockies Lynx Amendment FEIS, Record of Decision and Biological Assessment (exhibits C, D and E hereto). This indicates they were not considered or were excluded from the Final Rule. These extra-record materials can be considered by the court since they demonstrate "whether the agency has considered all relevant factors and has explained its decision." *Southwest Center for Biological Diversity v. U.S. Forest Service*, 100 F.3d 1443, 1450 (9th Cir. 1996).

Thus, the FWS used one standard for lynx "occupancy" under the ESA for its §7 consultations, and approved of the Forest Service using that standard in its management plans for all national forests in the Northern and Southern Rockies, while the FWS applied a different and more restrictive standard for occupancy for designating critical habitat. This inconsistency renders its decision arbitrary and capricious. *See, e.g., Marmolejo-Campos v. Holder*, 558 F.3d 903, 919 (9th Cir. 2009) ("agencies are *not* free . . . to generate erratic, irreconcilable interpretations of their governing statutes and then seek judicial deference.") (emphasis in original); *Natl. Wildlife Federation v. Natl. Marine Fisheries Service*, 524 F.3d 917, 932 (9th Cir. 2008) (finding that an "interpretation is unreasonable 'in light of [the regulation's] prior interpretation and application'") (quoting *Regents of Univ. of Cal. v. Shalala*, 82 F.3d 291, 294 (9th Cir. 1996)); and *NRDC v. EPA*, 526 F.3d 591, 607 (9th Cir. 2008) (vacating an EPA rule because it represented a complete departure from the agency's previous interpretation).

### 3. *The FWS applied an Unlawful "Self-sustaining" standard to the Southern Rockies*

The FWS raised the bar even higher for the Southern Rockies by requiring conclusive evidence of a "self-sustaining" population in an area before it could be designated critical habitat. *See,* Final Rule at 74 FR 8619, 8626, 8641.  Plaintiffs objected to this and the resulting exclusion of areas. AR A-2371–73.

16

The Forest Service objected to the FWS's standard in 2006, stating that "using uncertainty of sustainability as a criterion for excluding Colorado from critical habitat seems arbitrary, especially relative to lynx in Minnesota and Maine." Squires, AR L-4649.  It objected again in 2008 to the FWS excluding Colorado on those grounds. AR C-1427 ("using 'sustainability' as the criteria for excluding Colorado as critical habitat seems weak" since populations fluctuate).

The FWS's "self-sustainability" test has no basis in the statutory language for either occupied or unoccupied habitat.  As another Forest Service biologist pointed out, this test could not be met by virtually any endangered species, and logic dictates the need for more protection for a population that is not "self-sustaining," not less. McKelvey, AR L-4644.

## C.   THE FWS FAILED TO INCLUDE ALL OCCUPIED CRITICAL HABITAT REQUIRED BY ESA §3(5)(A)(i)

Under §3(5)(A)(i) of the ESA, the term "critical habitat" means: "(i) the specific areas within the geographic area occupied by the species, at the time it is listed. . . , on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection."  16 U.S.C. §1532(5)(A)(i).  As set forth below, the FWS did not include all areas that meet these requirements.

1.      *__Excluded Areas of  Montana__*

A map of the areas of Montana that the Forest Service included in the critical habitat designation is in the Final Rule.  74 FR 8687.  That demonstrates that several areas of national forests in western Montana were *not* included, contrary to the evidence before the agency.

To begin with, these omissions were inconsistent with the Lynx Conservation Assessment Strategy (LCAS), which was developed by the U.S. Forest Service, U.S. Bureau of Land Management, U.S. National Park Service and the FWS in 2000.  74 FR 8638.  The LCAS states: "Lynx have been documented, historically and currently, *throughout* the Rocky Mountains of Montana, from the Canadian border through the Yellowstone area." AR B-2337 (emphasis added).

It was also inconsistent with the 2007 Northern Rockies Lynx Management Direction, under which the U.S. Forest Service manages nine Montana National Forests. AR K-139.  That identifies the Lolo National Forest as "occupied" by lynx. AR K-159. In the 2006 Canada Lynx Conservation Agreement between the FWS and the U.S. Forest Service, the agencies found the Lolo occupied. AR L-4284.  The FWS also found it occupied in its 2007 Biological Opinion. AR K-59. Nonetheless, the Lolo National Forest is excluded from the Final Rule.

The FWS also excluded the Beaverhead-Deerlodge and Bitterroot national forests, despite lynx occurrence data from the Montana Department of Fish,

Wildlife and Parks (MTFWP).  Plaintiffs' comments included the MTFWP's maps of lynx data. AR A-2354; A-767. These show lynx in the Beaverhead-Deerlodge and Bitterroot, in addition to the Lolo. Another area the FWS omitted is south of MacDonald Pass in the Helena National Forest. The MTFWP map and tracking data submitted by Plaintiffs show occupancy there as well.  AR A-2352.      But there is no indication in the record that the FWS considered this or gathered and evaluated any MTFWP data on its own.

In addition, the Northern Rockies Lynx Amendment Final Environmental Impact Statement (Northern Rockies FEIS) identifies 53% of  the Lolo as being "lynx habit," with all of that being "occupied." AR K-607.  It identifies 61% of the Beaverhead-Deerlodge and 40% of the Bitterroot as "lynx habitat."  *Id.* The LCAS also sets forth the conditions comprising lynx habitat in these areas. AR B-3271.

These areas are due special management considerations and protections. *See, e.g.,* the Northern Rockies Lynx Amendment Record of Decision (Northern Rockies ROD), AR K-784; the Northern Rockies Biological Opinion, AR K-54; the LCAS, AR B-3271; and the Lynx Recovery Outline, AR B-3670.

Plaintiffs raised the omission of these areas in their comments. AR B-2352. However, the Final Rule does not respond to these comments on Montana or explain the omission of these particular areas.

## 2.   *Excluded Areas of Idaho*

The FWS designated a small portion of northeastern Idaho as critical habitat. 74 FR 8616, 8643.  However, it did not designate any other Idaho areas critical habitat. 74 FR 8662, 8687.

Nonetheless, based on the Northern Rockies FEIS, occupied lynx habitat includes the Clearwater National Forest in southeastern Idaho.   AR K-607. Plaintiffs' comments also provided information on lynx sightings in the Clearwater and Nez Perce National Forests, based on FWS and Forest Service records.   AR A-2353.

The Idaho Species Conservation Assessment, which was prepared in 1999 by the BLM, FWS, U.S. Forest Service and Idaho Department of Fish and Game, contains lynx occurrence data for Idaho's National Forests through 1998, including for the Clearwater from 1906-1997. *See* Exhibit F hereto at 8-11, 68-84.   That study identifies lynx habitat in northern and central Idaho. *Id.* at 14. Plaintiffs cited this study in their comments. AR A-2352 n.25. However, the FWS did not include it in the Administrative Record, which indicates that it was overlooked or excluded by the FWS.[9]

The Northern Rockies FEIS identifies 51% of the Clearwater as "lynx habitat" that is "occupied." AR K-607.  It lists 36% of the Nez Perce forest as lynx

_____

[9] This extra-record material can be considered by the court. *See* n. 8.

habitat. *Id.* The Northern Rockies ROD establishes management directions for these areas, as does the LCAS. AR B-3359–76. Plaintiffs raised the omission of Idaho in their comments. AR A-2352–53. However, the Final Rule does not respond to these comments on Idaho or explain the omission of these particular areas.

### 3.    *Exclusion of all Lynx Habitat in Colorado*

The FWS did not include any areas in Colorado in the critical habitat designation. That was arbitrary and capricious since Colorado meets the elements of 16 U.S.C. §1532(5)(A)(i).

First, Colorado was one of "the specific areas within the geographic area occupied by the species, at the time it is listed." According to the Colorado Division of Wildlife (CDOW), Colorado represents the southern-most historical distribution of lynx, where the species occupied the higher elevation, montane forests in the state. AR B-4089.  Colorado was included in the 2000 federal listing as lynx habitat. *Id.* at 4090. Areas of Colorado were occupied at the time the lynx was listed on March 24, 2000. 65 FR 16052, 16059.

The LCAS recounts the history of naturally occurring lynx occupancy in Colorado from the early 1900s through 1999. AR B-3334–41. It stated in 2000 that although rare, "*evidence indicates lynx have persisted to the present.*" *Id.* at 3335 (emphasis added).

21

The LCAS also describes the re-introduction of lynx by CDOW that began in 1999. *Id.* at 3336.  According to CDOW, from 1999-2007, 218 lynx were released in Colorado. AR B-4087. Of these, there were 98 mortalities of released adult lynx. *Id.* Successful reproduction was documented in 2003, 2004, 2005 and 2006.  *Id.*  That includes 6 litters and 16 kittens in 2003; and 14 litters and 39 kittens in 2004. Recovery Outline, AR B-3673 n.1. No dens were documented in 2007. AR B-4087. However, in 2008 another 10 kittens were born in the wild. *See* Exhibit G hereto.[10]

Second, many sources establish that Colorado contains "those physical or biological features [I] essential to the conservation of the species."  Colorado contains boreal forest landscapes supporting a mosaic of differing successional forest stages, snowshoe hares and other prey, winter snow conditions, sites for denning and matrix habitat that lynx are likely to travel through.  LCAS, AR B-3336–39; Recovery Outline, AR B-3674–75; Southern Rockies Lynx Amendment FEIS (Exhibit C hereto, at 67–78); CDOW Report, AR B-4087–91,4094–95,4100; and Plaintiffs' Comments, AR A-2453–58.

The Colorado habitat is so important that it is designated a "provisional core area" by the Lynx Recovery Outline. That means it contains all of the attributes of

---

[10] *Lynx Kittens Found in Spring Survey*, Colo. Division of Wildlife (July 24, 2009).

a "core area" such as "persistent verified records of lynx occurrence over time and recent evidence of reproduction." AR B-3672–73.

The U.S. Forest Service comments on the critical habitat listing are also instructive. See, Feb. 28, 2006 comment at AR, L-4647 ("There are also national forests throughout western Colorado that provide critical habitat for the reintroduced lynx population.').

In the Southern Rockies FEIS the Forest Service found, after ESA §7 consultation with the FWS, that Alternative B, which was developed from the LCAS, "provides management direction that would likely result in maintenance of sufficient habitat quantity, quality, distribution and conditions to allow the species to maintain breeding populations within most historic habitats." Exhibit C at 105. The Forest Service found the chosen Alternative F will "maintain viable populations" and "is expected to maintain habitat quality and connectivity, and will provide for persistence of the lynx population in the Southern Rockies over the long-term." Exhibit E at 27.

Third, Colorado lynx habitat requires "special management considerations or protections."   LCAS (AR B-3359–76); Lynx Recovery Outline (AR B-3675); Forest Service comments (AR C-1427); the Lynx Amendment ROD (Exhibit B); and the Gonzalez report (AR B-517).

Because Colorado is subject to these protections it should have been included in the critical habitat designation. *See*, *Center for Biological Diversity v. Norton*, 240 F.Supp.2d 1090, 1099 (D. Ariz. 2003)("the fact that a particular habitat does, in fact, require special management is demonstrative evidence that the habitat is 'critical.'"); and *Cape Hatteras Access Preservation Alliance v. DOI*, 344 F.Supp.2d 108, 123–24 (D.D.C. 2004) (requiring FWS to carefully consider whether the PCEs themselves are in need of special management considerations).

**D.   THE FWS's EXCLUSION OF ANY AND ALL "UNOCCUPIED" HABITAT DID NOT COMPLY WITH ESA §3(5)(A)(ii)**

"Critical habitat" is not limited to territory that is occupied or that contains the primary constituent elements (PCEs). Under ESA §3(5)(A)(ii),  the term "critical habitat" includes the "specific areas outside the geographical area occupied by the species at the time it is listed . . . upon a determination by the Secretary that such areas are essential for the conservation of the species." 16 U.S.C. §1532(5)(A)(ii).   Hence, under the language of the statute, this "unoccupied" habitat need not contain the PCEs in the area to qualify as critical habitat.

That standard differs from the one for occupied habitat, in ESA §3(5)(A)(i), which is limited to areas "on which are found those physical and biological features (I) essential to conservation of the species." 16 U.S.C. §1532(5)(A)(i).

This distinction is significant because the FWS did not include *any* unoccupied habitat in the critical habitat designation. It states in its Answer: "Defendants admit no unoccupied habitat is designated critical habitat." (Answer ¶¶60-61). Therefore, the FWS found that *no* unoccupied areas "are essential for the conservation of the species." That means when it wrongly designated occupied habitat as unoccupied, it wrongly excluded all of that habitat from its critical habitat designation.

In addition, the FWS wrongly excluded: a) unoccupied "linkage" or "travel" corridors; and b) habitat that is currently unoccupied but is essential since it will provide habitat in the future, as current habitat is lost due to climate change.

The FWS acknowledged that linkage corridors are important. 74 FR 8626. However, it would not designate them critical habitat unless they met the standard for occupied habitat in ESA §3(5)(A)(i), *i.e.* that is unless they were occupied *and* contained the PCEs. *Id.*

That was a crucial mistake of fact and law because the Administrative Record is replete with evidence that linkage corridors are essential to the conservation of the species, regardless of whether they are considered "unoccupied" because lynx moving through them are transient or whether they lack the PCEs. Therefore, the FWS should have applied the standard for

unoccupied habitat in ESA §3(5)(A)(ii) to these areas, but it failed and refused to do so.

The LCAS contains a section entitled *Landscape Connectivity* that describes how lynx are arranged as individual metapopulations that are connected by "linkages."  It states: "An interconnected ecosystem is essential to maintain the ability of subpopulations to expand and colonize new habitats, to recolonize areas where subpopulations have been locally extirpated or to provide population support to declining populations, to allow individuals to find mates among neighboring subpopulations, and to effect dispersal and genetic interchange." AR B-3341. These linkage areas include areas that do not contain PCEs, such as "non-forest environments" and "wooded riparian communities [that] may provide travel cover across open valley floors between mountain ranges, or lower elevation ponderosa pine, pinyon-juniper woodlands or shrublands that separate high elevation spruce-fir forests." *Id.* at 3384.

The Northern Rockies ROD also discusses maintaining habitat connectivity between lynx populations. AR K-783–84. It defines "linkage areas" as including areas "both within and between geographic areas where blocks of lynx habitat are separated by intervening areas of *non-lynx habitat* such as basins, valleys, agricultural lands, or where lynx habitat naturally narrows between two blocks." AR K-820 (emphasis added).  The Administrative Record includes a 2007 Forest

Service map of these areas, identifying linkages in the central and eastern Idaho national forests, to and from the Lolo, Bitterroot and Beaverhead-Deerlodge national forests, and into Wyoming, Utah and Colorado, which connect the southern lynx populations to the northern ones. AR K-824. [11]

Likewise, the Southern Rockies FEIS lists 38 habitat linkage zones in need of protection.  *See* Appendix D to Exhibit E.  It stresses that "the connectivity and linkage standards may be some of the most critical standards for lynx." *Id.* at 100–01. According to CDOW, numerous "travel corridors" were used repeatedly by more than one lynx. AR B-4095.  It confirmed that lynx from Colorado have spread into New Mexico, Utah and Wyoming. *Id*. at 4095–97,4101.  The FWS recently included the New Mexico population of lynx in the "threatened" listing. 73 FR 76990.

The southern linkage areas were mapped by the Forest Service in 2006. *See* Exhibit H hereto. However, this map is not in the Administrative Record, which indicates it was not considered by the FWS in the Final Rule.

Linkage areas are also essential in light of climate change. It is imperative to protect corridors between the current habitat and the future habitat, regardless of whether the future habitat is currently occupied, to enable lynx to migrate into those areas. Plaintiffs' Comments, AR A-2368.

---

[11] In 2002 the Forest Service had a similar map of linkage areas that is Exhibit J hereto.

The protection of unoccupied areas to account for climate change is not limited to linkage areas. The study of Gonzalez *et. al*. identifies the location of potential habitat through 2100. AR B-518, 520–21, 526.   Regardless of whether this habitat is occupied and contains PCEs in the present, the FWS should have considered whether it is necessary for conservation of the species under ESA §3(5)(A)(ii). *See,* AR A-2368. The FWS's failure to analyze these factors in excluding any and all "unoccupied" habitat from its Final Rule renders it arbitrary and capricious.

## E.   THE FWS DID NOT APPLY THE BEST AVAILABLE SCIENTIFIC DATA AND UNLAWFULLY EXCLUDED DATA

The FWS did not comply with the requirement of 16 USC §1533(b)(1)(B)(2) to apply the best available scientific data. Several examples are set forth above, such as: 1) climate change information; 2) MTFWP data; 3) the Idaho Conservation Assessment; 4) the southern linkage zone maps; and 5) the Forest Service's Southern Rockies Lynx Amendment FEIS, ROD and Biological Assessment.

In addition, the FWS consciously disregarded pre-1995 lynx data. It did so regardless of whether an area had been surveyed for lynx since 1995. The Forest Service objected to this in 2006, stating:  "Some areas, identified as core areas, have received no valid survey efforts within this time period. Thus, for these areas, it is impossible to meet these [FWS] criteria regardless of the current status of lynx

28

populations." Forest Service Letter, AR L-4644.  The Forest Service gave the

Kettle Range in northeastern Washington and the Idaho panhandle as examples. *Id.*

As the Forest Service pointed out, the FWS's standard meant that the FWS was

basing its rule  "on past survey effort rather than any biological or ecological

principles." *Id.*  It repeated this objection in 2008. AR C-1427.

This data cut-off conflicted with the agency's obligation to base its decision

on the best "available" data and rendered its decision arbitrary and capricious. *See,*

*Sierra Club v. Leavitt*, 488 F.3d 904, 913–14 (11th Cir. 2007) (agency failure to

consider water quality data more than 7.5 years old violated EPA regulation

requiring evaluation of all readily "available" data).


## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that they be

granted summary judgment against Defendants, and that the Final Rule be

remanded to the agency to address the legal deficiencies set forth above, so that the

agency can include the areas unlawfully omitted from the critical habitat

designation for the Canada lynx.

Respectfully Submitted, this 7th day of October, 2009.

**/s/ Eric E. Huber**
Eric E. Huber
Colo. Bar No. 40664
Sierra Club
1650 38th St. Ste. 102W
Boulder, Colorado 80301
Tel: (303) 449-5595
Fax: (303) 449-6520
eric.huber@sierraclub.org

**/s/ Timothy Bechtold**
Timothy M. Bechtold
Mont. Bar No. 4376
Bechtold Law Firm, PLLC
317 East Spruce Street
P.O. Box 7051
Missoula, Montana 59807
Tel: (406) 721-1435
Fax: (406) 830-3085
tim@bechtoldlaw.net

**/s/ Rebecca Smith**
Rebecca K. Smith
Mont. Bar No. 9658
PUBLIC INTEREST
DEFENSE CENTER, P.C.
P.O. Box 7584
Missoula, Montana 59807
Tel: (406) 531-8133
Fax: (406) 830-3085
publicdefense@gmail.com

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(d), I certify that the attached brief is proportionately spaced, has a typeface of 14 points or more, and contains 6,469 words of text.

Dated this 7th day of October 2009.

Respectfully submitted,

**/s/ Eric E. Huber**
Eric E. Huber

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of October, 2009, a true and accurate copy of the foregoing and all attachments thereto was filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following email addresses:

| | |
|---|---|
| JOHN H. MARTIN III<br>U.S. Department of Justice<br>1961 Stout Street, 8th Floor<br>Denver, CO 80294<br>Tel: (303) 844-1383<br>john.h.martin@usdoj.gov | |

/s/ Eric E. Huber
Eric E. Huber