WILLIAM W. MERCER
United States Attorney for the District of Montana
MARK SMITH, Assistant United States Attorney
2929 3rd Ave. North, Suite 400
Billings, MT 59101
Tel: (406) 657-6101
Fax: (406) 657-6989

JOHN CRUDEN, Acting Assistant Attorney General
JEAN E. WILLIAMS, Chief
JOHN H. MARTIN III, Trial Attorney (CO Bar # 32667)
U.S. Department of Justice
Environment and Natural Resources Division
Wildlife and Marine Resources Section
1961 Stout Street, 8th Floor
Denver, CO 80294
john.h.martin@usdoj.gov
Tel: (303) 844-1383
Fax: (303) 844-1350

***Attorneys for Federal Defendants***

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | | |
|---|---|---|
| ALLIANCE FOR THE WILD ROCKIES, | ) | |
| NATIVE ECOSYSTEMS COUNCIL, | ) | |
| CENTER FOR NATIVE ECOSYSTEMS, | ) | |
| AND SIERRA CLUB, INC., | ) | CV 09-73-M-DWM |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JANE LYDER, Deputy Assistant | ) | |
| Secretary of the Department of the Interior; | ) | |

KENNETH SALAZAR, Secretary of the   )
Department of the Interior; and U.S.   )
FISH AND WILDLIFE SERVICE,   )
  )
        Defendants.   )
_____)

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

PAGE

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I. BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A. Statutory Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B. The Revised Critical Habitat Designation . . . . . . . . . . . . . . . . . . . . 5

        1. Defining the PCE for Lynx . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        2. Determining the Areas Containing PCE . . . . . . . . . . . . . . . . . 7

II. STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

III. THE CRITICAL HABITAT DESIGNATION REASONABLY
ADDRESSES THE IMPACTS OF CLIMATE CHANGE ON LYNX . . . . 9

    A. FWS Reasonably Considered the Impact of Climate Change on the
Lynx . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        1. FWS Considered the Best Scientific Data Available . . . . . . . 11

        2. FWS Did Not Delay Consideration of Climate Change . . . . . 12

    B. The Final Rule Reasonably Addresses Climate Change Impacts . . . 13

IV. FWS PROPERLY DEFINED THE AREAS OCCUPIED BY THE SPECIES
AS THOSE OCCUPIED BY A POPULATION OF LYNX . . . . . . . . . . . 16

    A. Plaintiffs' Claim Is Based on a Mistaken Interpretation of FWS'
Methodology for Locating Critical Habitat . . . . . . . . . . . . . . . . . . . 17

i

B.   FWS's Definition of the Geographic Area Occupied by the Lynx At the Time It Was Listed Is Entitled To Deference . . . . . . . . . . . . . . . 21

C.   FWS's Method in the Rule for Locating the Areas Occupied by the Species Is Consistent with Other Decisions Regarding the Lynx  . . 23

D.   FWS Declined to Designate the Southern Rockies as Critical Habitat Based on Accepted Principles of Conservation Biology and Its Assessment that the Area Was Not Essential to the Conservation of Lynx  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

V.   THE AREAS PROPOSED BY PLAINTIFFS ARE NOT ESSENTIAL TO THE CONSERVATION OF THE LYNX . . . . . . . . . . . . . . . . . . . . . . . . . 30

A.   Excluded Areas of Montana and Idaho Lack Necessary Evidence of PCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

VI.   THERE IS NO BASIS TO DESIGNATE UNOCCUPIED AREAS AS CRITICAL HABITAT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

VII.   FWS CONSIDERED THE PROPER SCIENTIFIC DATA . . . . . . . . . . . 37

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

TABLE OF AUTHORITIES

CASES                                                                              PAGE

Arizona Cattle Growers Ass'n v. Kempthorne,

    534 F. Supp. 2d 1013, 1028 (D. Ariz. 2008)  . . . . . . . . . . . . . . . . . . . . 19, 20

Baltimore Gas and Elec. Co. v. Natural Res. Def. Council,

    462 U.S. 87, 103 (1983)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Bennett v. Spear, 520 U.S. 154, 172 (1997)  . . . . . . . . . . . . . . . . . . . . . . . 9, 11, 14

Cape Hatteras Access Pres. Alliance v. U.S. Dep't of Interior,

    344 F. Supp. 2d 108, 120 (D. D.C. 2004)  . . . . . . . . . . . . . . . . . . . . . . . 19, 33

Center for Biological Diversity v. U.S. Fish and Wildlife Serv.,

    450 F.3d 930, 943 (9th Cir. 2006)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Chevron U.S.A. v. Natural Res. Def. Council, 467 U.S. 837 (1984)  . . . . . . . . . . 19

Conner v. Burford, 848 F.2d 1441, 1454 (9th Cir.1988)  . . . . . . . . . . . . . . . . . . . . 11

Gifford Pinchot Task Force v. U.S. Fish and Wildlife Serv.,

    378 F.3d 1059, 1067 (9th Cir. 2004)  . . . . . . . . . . . . . . . . . . . . . . . 9, 24, 29

Kern County Farm Bureau v. Allen, 450 F.3d 1072, 1080-81 (9th Cir.  2006)  . . . 9

Lands Council v. McNair, 537 F.3d 981, 987 (9th Cir. 2008)  . . . . . . . . . . . . . . . 7

National Wildlife Fed'n v. U.S. Army Corps of Eng'rs,

    384 F.3d 1163, 1174 (9th Cir. 2004)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Native Ecosystems Council v. Dombeck, 304 F.3d 886, 891 (9th Cir. 2002) . . . . 7

Occidental Eng'g Co. v. INS, 753 F.2d 766, 770 (9th Cir.1985) . . . . . . . . . . . 7, 8

Southwest Ctr. for Biological Diversity v. Babbitt,

    215 F.3d 58 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

STATUTES

5 U.S.C. § 551 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

16 U.S.C. § 1531(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

16 U.S.C. §§ 1531 to 1599 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

16 U.S.C. § 1532 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

16 U.S.C. § 1532(5)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 36

16 U.S.C. § 1532(5)(A)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

16 U.S.C. § 1532(5)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

16 U.S.C. § 1533(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

16 U.S.C. § 1533(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 9

16 U.S.C § 1536 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

FEDERAL REGULATIONS

50 C.F.R. § 17.95(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4

50 C.F.R. § 424.12(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

50 C.F.R. § 424.12(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

iv

65 Fed. Reg. 16052 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 22

65 Fed. Reg. 16054-16059 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

68 Fed. Reg. 40076 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

68 Fed. Reg. 40077 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 20, 21, 25

68 Fed. Reg. 40079 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

68 Fed. Reg. 40090 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

71 Fed. Reg. 66008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

71 Fed. Reg. 66032-66036 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

72 Fed. Reg. 1186 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

72 Fed. Reg. 1188 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 20

72 Fed. Reg. 1188/3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

72 Fed. Reg. 1189 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

73 Fed. Reg. 10860 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

73 Fed. Reg. 10863 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

73 Fed. Reg. 10867 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

73 Fed. Reg. 10868 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

73 Fed. Reg. 10869 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 8, 16

73 Fed. Reg. 10869-10870 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

73 Fed. Reg. 10869-10871 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

73 Fed. Reg. 10869-10873 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 8

73 Fed. Reg. 10870-10871 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

73 Fed. Reg. 10871 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 24, 35

73 Fed. Reg. 10872 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

73 Fed. Reg. 10872-10873 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 20

74 Fed. Reg. 8616 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4, 5

74 Fed. Reg. 8616-8617 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

74 Fed. Reg. 8616-8702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

74 Fed. Reg. 8617 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

74 Fed. Reg. 8618 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

74 Fed. Reg. 8621 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

74 Fed. Reg. 8625-8626 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

74 Fed. Reg. 8626 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

74 Fed. Reg. 8634-8638 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

74 Fed. Reg. 8635-8642 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

74 Fed. Reg. 8638 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

74 Fed. Reg. 8640 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 8, 16, 20, 32, 34, 36

74 Fed. Reg. 8640-41 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 20, 32

74 Fed. Reg. 8640/1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

74 Fed. Reg. 8640/3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

74 Fed. Reg. 8640-8642 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

74 Fed. Reg. 8641 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 26

74 Fed. Reg. 8642 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31

74 Fed. Reg. 8642-8644, 8662 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

74 Fed. Reg. 8671 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

74 Fed. Reg. 8687 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

## INTRODUCTION

Canada lynx (*Lynx canadensis*) are medium-sized cats of 18 to 23 pounds that are often confused with bobcat due to their similar appearance.  74 FR 8616, 8640 (Feb. 25, 2009).  Lynx are highly specialized predators of snowshoe hare, which comprise a majority of their diet.  74 FR 8616-8617.  The United States Fish and Wildlife Service (FWS) listed lynx as a threatened species under the Endangered Species Act, 16 U.S.C. §§ 1531 to 1599 ("ESA") in a fourteen state Distinct Population Segment (DPS) in March 2000.  65 FR 16052 (March 24, 2000).[1]

Plaintiffs challenge Defendants' promulgation of a rule codified at 50 C.F.R. § 17.95(a) designating approximately 39,000 miles[2] as critical habitat for the lynx DPS.  74 FR 8616-8702. Plaintiffs allege that the rule does not comply with various provisions of the ESA or is otherwise arbitrary. Plaintiffs' claims fail for the reasons identified below.

## I.  BACKGROUND

### A.  Statutory Background.

---

[1]FWS clarified this listing decision in 2003 and 2007 with additional analyses of the areas it deemed a significant portion of the range of the DPS.  68 FR 40076 (July 3, 2003) and 72 FR 1186 (Jan. 10, 2007).

The ESA provides "a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b). Section 4 of the ESA directs that FWS "to the maximum extent prudent and determinable . . . (i) shall, concurrently with [listing a species as threatened or endangered], designate any habitat of such species which is then considered to be critical habitat; and (ii) may, from time-to-time thereafter as appropriate, revise such designation." 16 U.S.C. § 1533(a)(3).

Section 3(5)(A) of the ESA defines "critical habitat" as:

> (i) the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of section 1533 of this title, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and

> (ii) specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions of section 1533 of this title, upon a determination by the Secretary that such areas are essential for the conservation of the species.

16 U.S.C. § 1532(5)(A). The "physical or biological features" required in occupied critical habitat are defined in terms of "primary constituent elements" ("PCEs"). 50 C.F.R. § 424.12(b). The physical and biological features are the PCEs "laid out in a specific quantity and spatial arrangement to be essential to the conservation of the

species."  74 FR 8638.

FWS must designate critical habitat "on the basis of the best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other relevant impact of specifying any particular area as critical habitat." 16 U.S.C. § 1533(b)(2).  Another limit on the designation of critical habitat is the provision in ESA section 3(5)(C) that "[e]xcept in those circumstances determined by the Secretary, critical habitat shall not include the entire geographical area which can be occupied by the threatened or endangered species."  16 U.S.C. § 1532(5)(C).

B.      The Revised Critical Habitat Designation.

The FWS designated 1,841 miles[2] as critical habitat for the lynx in 2006.  71 FR 66008 (Nov. 9, 2006).   In 2007, FWS began a new rulemaking for the critical habitat designation due to concerns over inappropriate political influence and that the exclusion of U.S. Forest Service and other lands from the designation may not have been correct.  I-8409.[2]

The FWS proposed to add 40,913 miles[2] to the existing designation, primarily the U.S. Forest Service, BLM, and other lands that had  been left out of

_____

2References to the Administrative Record will cite to the alphabetical prefix and number endorsed on the pertinent page.

3

the original designation as not requiring special management.  73 FR 10860, 10867

(Feb. 28, 2008); compare 71 FR 66032-66036.  The Final Rule revised the

designation to include approximately 39,000 miles[2]  as critical habitat in five units

in Maine (Unit 1), Minnesota (Unit 2), Montana and Idaho (Unit 3: Northern Rocky

Mountains), Washington (Unit 4: North Cascades), and Wyoming (Unit 5: Greater

Yellowstone Area, including part of southwestern Montana).  74 FR 8616, 8642-

8644, 8662.

> 1.    Defining the PCE for Lynx.

In reaching this decision FWS first determined the habitat areas that provide

the essential life cycle needs of the lynx by defining a single PCE.  FWS determined

that the PCE for lynx is "boreal forest landscapes supporting a mosaic of differing

successional forest stages" and providing one or more beneficial habitat elements

for lynx including snowshoe hares for prey, abundant large, woody debris piles for

dens, and appropriate winter snow conditions. 50 C.F.R. § 17.95(a); 74 FR 8634-

8638.

FWS' strategy in defining this PCE is to locate "boreal forest landscapes of

sufficient size to encompass the temporal and spatial changes in habitat and

snowshoe hare populations to support interbreeding lynx populations or

metapopulations over time."  74 FR8640. The FWS decided to locate areas "based

on evidence of breeding populations"   because evidence of "consistent occupancy and reproduction by lynx" confirms that an area contains the PCE "in sufficient quantity and spatial arrangement."   74 FR 8640; 73 FR 10869-10873.  These particular features are essential for the survival and recovery of the species:

> because areas with these characteristics represent resiliency during population lows, which is key to the species' survival. Areas that meet these criteria contrast with areas that may serve as temporary habitat for unsuccessful dispersers during population highs, but do not support lynx reproduction, and therefore are not likely to play a role in lynx conservation.

74 FR 8640.

This dichotomy in types of lynx habitat is a function of lynx biology and the nature of the available habitat in the United States.  73 FR 10872-10873.  In the contiguous United States, the boreal forest is at its southernmost extent, transitions into other vegetation communities, and is naturally patchy.  74 FR 8616.  Not all areas of boreal forest are large enough or of high enough quality habitat to support a resident lynx population over the long term, especially in those times and places where snowshoe hare densities are low.  72 FR 1188.  Lynx disperse long distances, primarily when hare populations decline.  74 FR 8671.  They colonize suitable but unoccupied habitats, augment existing resident populations, or disperse to habitats where they cannot survive.  68 FR 40077. Hence, the range of the lynx in the contiguous United States is comprised of areas supporting resident, breeding

populations that serve as sources of dispersing animals to secondary or peripheral areas that do not likely play a significant role in sustaining persistent lynx populations.  74 FR 8640-8642; 73 FR 10873-10873; 72 FR 1188; 68 FR 40077.

2.      Determining the Areas Containing PCE.

FWS then delineated the specific areas containing the PCE in the necessary arrangement to support populations by applying a two part analysis derived from the statutory definition of "critical habitat" for occupied areas.  16 U.S.C. § 1532(5)(A)(i).  Its first step was to rely "on information used during listing of the species, and any available newer information, to delineate the geographic area occupied by the species at the time of listing."  74 FR 8640; 73 FR 10869. Although it reviewed data on the known historical range of lynx, *inter alia*, FWS confirmed occupancy at the time of listing using verified lynx records since 1995. Id.

In the second step of its analysis FWS   "used the best available scientific information to determine which occupied areas contain the physical and biological features essential to the conservation of the lynx."  74 FR 8640.  FWS located the PCE through review of verified lynx records and evidence of breeding populations, as well as analysis of boreal forest characteristics, direct connectivity to lynx populations in Canada, and other available data (such as snow depth and bobcat

records).  74 FR 8640-8641.  FWS gave in-depth consideration to habitat quality and distribution during its deliberations about habitat unit boundaries.  74 FR 8641; 73 FR 10870-10871.  FWS also determined that no unoccupied areas had evidence of consistently supporting reproducing lynx populations in the past, so only occupied areas were found to be essential to the conservation of the DPS and designated as critical habitat.

## II.  STANDARD OF REVIEW.

All claims in this case are governed by the standard of review under the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq*. (APA).  Native Ecosystems Council v. Dombeck, 304 F.3d 886, 891 (9th Cir. 2002). Review under the arbitrary and capricious standard of the APA is narrow, and the reviewing court may not substitute its judgment for that of the agency.   Lands Council v. McNair, 537 F.3d 981, 987 (9th Cir. 2008) (*en banc*).

When the district court reviews an administrative agency decision under the APA, "summary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did." Occidental Eng'g Co. v. INS, 753 F.2d 766, 770 (9th Cir.1985).  "[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."

Occidental Eng'g, 753 F.2d at 769.

## ARGUMENT

## III.  THE CRITICAL HABITAT DESIGNATION REASONABLY ADDRESSES THE IMPACTS OF CLIMATE CHANGE ON LYNX.

Plaintiffs claim that FWS failed to base the critical habitat designation on the best scientific data available on climate change.  Pl. Br. at 6-12.  This claim lacks merit.

### A.   FWS Reasonably Considered the Impact of Climate Change on the Lynx.

FWS located the areas essential to the conservation of lynx through the use of biologically based criteria as summarized above. 73 FR 10869; 74 FR 8635-8642. FWS designed its criteria to reliably identify those areas with the ability to support viable populations of lynx, as distinguished from areas that served primarily as population sinks or that are not likely to maintain lynx populations over the long term.  74 FR 8640-41; 73 FR 10869-10873.  Hence, FWS "focused on consistency of lynx presence and reproduction, because areas with these characteristics represent resiliency during population lows, which is key to the species' survival." 74 FR 8640/1.  It was entirely reasonable for FWS to conclude that areas outside the critical habitat units were not essential to the conservation of the species if there was not evidence such areas could support viable lynx populations.  This approach

8

is consistent with the presumption set out in the definition of critical habitat that

"critical habitat shall not include the entire geographical area which can be occupied

by the threatened or endangered species."  16 U.S.C. § 1532(5)(C).

      1.   <u>FWS Considered the Best Scientific Data Available</u>.

ESA Section 4(b)(2) requires, among other considerations, that "[t]he

Secretary shall designate critical habitat . . . on the basis of the best scientific data

available."  16 U.S.C. § 1533(b)(2).  This provision imposes only a procedural

obligation.  <u>Bennett v. Spear</u>, 520 U.S. 154, 172 (1997).  The ESA's best available

data requirement means only that FWS "cannot ignore available biological

information."  <u>Kern County Farm Bureau v.  Allen</u>, 450 F.3d 1072, 1080-81 (9th

Cir.  2006) (quoting <u>Conner v. Burford</u>, 848 F.2d 1441, 1454 (9th Cir.1988)).  The

critical habitat rule includes lands in specific contemplation of the likely effect of

climate change, demonstrating that FWS did consider the available data on climate

change.

The preambles to the Proposed and Final Rules explain FWS's analysis of

climate change and its impact on lynx.  74 FR 8617 & 8621 and 73 FR 10867.  The

Final Rule designated as critical habitat the higher elevation areas within each of the

areas capable of supporting viable populations of Canada lynx "that lynx would be

able to continue to use if lynx distribution or habitat shifted upward in elevation"

due to increases in temperature.  74 FR 8617.  The FWS expressly considered the

scientific data cited by Plaintiffs, as Plaintiffs concede, and acted upon it, albeit not

in the fashion espoused by Plaintiffs.  Pl. Br. at 6-9.  This consideration satisfies the

ESA's requirement to base the designation of critical habitat on the best available

data.

2.    <u>FWS Did Not Delay Consideration of Climate Change</u>.

Relatedly, Plaintiffs also charge that FWS unlawfully delayed consideration

of the climate change information.  Pl. Br. at 9-10.  The sentence Plaintiffs rely

upon states that "this information . . . still needs to be evaluated further to determine

how climate change might affect lynx."  74 FR 8617. FWS's use of "further"

signals that it had already considered such information, but would nonetheless

continue to consider the issue in the future.

This statement is unremarkable because "[r]evisions to the critical habitat

designation may be necessary in the future to accommodate shifts in the occupied

range of the lynx" due to climate change.  74 FR 8617.  FWS mentioned the 5-year

review because it is the next place it will evaluate any new information relevant to

climate change effects on lynx.  FWS reasonably decided to designate areas that

"are occupied and currently contain the physical and biological features essential to

the conservation of the lynx," while pointing out the probability of adjusting the

10

designation in the future if (or when) circumstances changed.  73 FR 10863; 74 FR

8617.  This reasoned response satisfies the ESA because "[i]n the ordinary course,

any endangered or threatened species may have some habitat that is not deemed

critical habitat."   Gifford Pinchot Task Force v. U.S. Fish and Wildlife Serv., 378

F.3d 1059, 1067 (9th Cir. 2004).

      B.    The Final Rule Reasonably Addresses Climate Change Impacts .

Plaintiffs also argue that FWS unreasonably declined to designate areas

outside of the present critical habitat units.  Pl. Br. 10-12.  This claim challenges the

substance of Defendants' decision, and must proceed under the APA's arbitrary and

capricious standard.  Bennett, 520 U.S. at 172, 176.  Assessment of climate change

impacts on the lynx requires prediction and weighing uncertain data at the frontiers

of science.  Where such expertise is involved, "a reviewing court must be highly

deferential to the judgment of the agency."  National Wildlife Fed'n v. U.S. Army

Corps of Eng'rs, 384 F.3d 1163, 1174 (9th Cir. 2004) (citing Baltimore Gas and

Elec. Co. v. Natural Res. Def. Council, 462 U.S. 87, 103 (1983).

Where FWS took a different position than Plaintiffs espouse, the climate

change articles that Plaintiffs cite are consistent with the FWS' decision.  Those

reports conclude that warming temperatures will negatively affect lynx habitat by

reducing snowpack, melting snowpack earlier and shifting distribution of boreal

forest northward (in latitude) and upwards in elevation. B.514-532; B.479-490; B.961.

Based on this scientific literature, FWS determined that "up to two-thirds of the lynx range in the lower 48 States may become unsuitable by 2100." 73 FR 10867. If projections of future lynx habitat prove correct, that data would not support, let alone compel, the designation of any additional areas as critical habit. The Gonzalez article, in particular, shows no gain in lynx habitat in the contiguous United States under global warming scenarios, and a significant loss of what it mapped as present lynx habitat. B.000523; B.000532. FWS reasonably interpreted this information to mean that the ability of areas outside the designated critical habitat units to support resident lynx populations would worsen, not improve, over time. Plaintiffs' comparison of the Gonzalez habitat map with FWS' map of critical habitat neglects this key consideration. Pl. Br. at 8.

FWS determined that areas outside of the designated critical habitat units presently lack the ability to sustain viable populations of lynx. There is no evidence in the climate change articles that the areas outside of the designated units presently contain, or are projected to develop, the PCE in the quantity and spatial arrangement required to support resident lynx populations. 73 FR 10869- 10871. To the contrary, the reports cited by Plaintiffs show that lynx habitat characteristics

in these areas, such as extent of boreal forest and extent and depth of snowpack, will be reduced under climate warming, further reducing any viability to support populations.  B.525-532; B.2917-2918; I.4618; I.8084-8085.

Relatedly, Plaintiffs argue that FWS did not identify the currently designated habitat that will be lost to climate change.  Pl's Br. at 11.  FWS is required only to "designate any habitat of such species which is  then considered to be critical habitat." 16 U.S.C. § 1533(a)(3)(A)(i) (emphasis added).  The possibility that critical habitat units may lose the PCE due to climate change does not require FWS to designate as critical habitat "backup" areas that are not "essential to the conservation of the species" due to the fragmented and marginal habitat in those areas.

Lynx require more than high levels of snowfall and generic boreal forest. While the Gonzalez report,  B.000514, estimates some of the remaining lynx habitat components after climate warming, it does not address whether any of the remaining areas would support high density snowshoe hare populations at a landscape scale or if they would support lynx populations that may play a role in conserving the DPS.  The limited data and analyses in the climate studies lack any "reliable projections of future climate in lynx habitat" that would support the conclusion that any areas meet FWS' criteria for critical habitat.  74 FR 8621.

FWS' conclusion here was reasonable and fully consistent with the reports on climate change impacts.  Bennett, 520 U.S. at 176 ("The obvious purpose of the requirement that each agency 'use the best scientific and commercial data available' is to ensure that the ESA not be implemented haphazardly, on the basis of speculation or surmise.")

IV.  FWS PROPERLY DEFINED THE AREAS OCCUPIED BY THE SPECIES AS THOSE OCCUPIED BY A POPULATION OF LYNX.

Plaintiffs' next claim that FWS used unlawful criteria to identify critical habitat, in particular by requiring evidence of both occupancy and evidence of reproduction since 1995 in order to designate an area as occupied.  Pl. Br. 12-17. Plaintiffs assert that these criteria are contrary to the definition of "critical habitat" in the ESA.

This claim fails on legal and factual grounds.  The term "occupied" as used in Section 3(5)(A) is ambiguous and FWS' reasonable definition of the term in the context of this rulemaking is entitled to   Chevron deference.  Moreover, FWS had a sound scientific basis for defining occupancy based on evidence of a lynx population instead of the occurrence of a solitary individual.

Furthermore, Plaintiffs misunderstand the criteria that FWS used to identify critical habitat.  FWS employed a two-step analysis for identifying critical habitat.

14

First, it identified those areas occupied by lynx at the time of listing.  Then it

considered whether the occupied habitat contained the physical and biological

features essential to the conservation of the species.  Under this two step analysis,

for example, even though FWS found the Southern Rockies to be occupied by lynx,

it found that available data showed that lynx had not established, and were not

likely to establish, a population there due to the marginal quality and fragmented

distribution of the habitat, and therefore the Southern Rockies did not contain any

areas with the PCE.

A.   Plaintiffs' Claim Is Based on a Mistaken Interpretation of FWS'
     Methodology for Locating Critical Habitat .

Plaintiffs claim that FWS required evidence of both lynx occurrence *and*

reproduction since 1995 in order for an area to be considered part of "the

geographic are occupied by the species, at the time it is listed" under ESA section

(3)(5)(A)(i).  Pl. Br. 12-14.  FWS did not use the mechanical two part test Plaintiffs

assert to identify areas occupied by the species at the time of listing.  Rather, FWS

used both sources of data, verified records of (a) lynx occurrence and (b) evidence

of reproduction, to identify the areas occupied by the lynx at the time of listing.  74

FR 8640-41; 73 FR 10869-10870.  Plaintiffs' distortion of FWS' methodology for

identifying the geographic area occupied by the lynx is contrary to FWS'

15

description of its method in the Final Rule, evidence in the administrative record, and the FWS' final decision on the areas occupied by lynx.

In its preambles, FWS explained that its first step in identifying critical habitat had been to rely "on information used during listing of the species, and any available newer information, to delineate the geographic area occupied by the species at the time of listing." 74 FR 8640; 73 FR 10869. This statement of FWS' methodology plainly embraces a broad set of information, not limited to evidence of reproduction since 1995. FWS' listing decision in 2000 canvassed multiple sources of information in deciding the distribution of lynx, not limited to evidence of reproduction. 65 FR 16054-16059. For instance, FWS relied on an article by McKelvey *et alia*, History and Distribution of Lynx in the Contiguous United States, B.002916-2973, which did not require evidence of reproduction to delineate lynx distribution, but instead relied upon a variety of lynx occurrence data and other analyses. B.001012.

In addition, FWS specifically sought "the location of any additional reproducing populations *or* occurrences of the lynx not previously submitted in reports to FWS." C. 001441-1473 (emphasis added). FWS requested lynx occurrence records from many sources. D.004464; D.004476; D.004444; D.004800; D.004481; D.004448; D.004385. After FWS obtained occurrence

16

data, it consulted with experts to assess whether it was properly considering occurrence data. D.004419; D.004417; D.004415; D.004414; D.004395; D.004372; D.004359. The FWS later compiled these occurrence records for internal consideration.[3] D.004379; D.004359; D.004362; D.004356; D.004434; D.004431; D.004439; D.004319; D.004316; D.004209; D.004203. FWS repeated many of these steps in 2008 when it revised its designation. See generally I.1402-I.8659. FWS would not have considered such occurrence data had it already decided to disregard such information unless it was co-extensive with evidence of reproduction since 1995.

During the analyses leading to the first and second critical habitat proposals in which all historical evidence was analyzed, FWS did not find convincing evidence that areas outside of the area proposed in 2008 had consistently supported lynx populations in the past. FWS concluded that the lynx had a "broad distribution," and stated:

> In summary, the area occupied by the lynx in the contiguous United States is broadly delineated by the distribution of the southern extensions of boreal forest, which occur in the Northeast (portions of Maine, New Hampshire, Vermont, New York); the western Great Lakes (portions of Minnesota,

---

[3]These records all predate the first critical habitat designation, but the FWS's revised critical habitat designation was based in large part on a draft rule that existed prior to all Federal lands being excised from the rule in 2005. FWS also considered this information when revising the rule. I.8421; I.8280.

Wisconsin, Michigan); the Northern Rocky Mountains/Cascades (portions of Washington, Oregon, Idaho, Montana, northwestern Wyoming, Utah); and the Southern Rocky Mountains (portions of Colorado, southeastern Wyoming).

73 FR 10871.  FWS deemed many of these areas occupied regardless of whether it had evidence of reproduction since 1995.  For example, FWS found Vermont "occupied" even though it had previously found "only four verified records of historic lynx occurrence exist . . . [and] no evidence of a breeding population ever occurring in Vermont."  72 FR 1188/3.  Thus, Plaintiffs have misstated FWS' methodology, and their argument fails.

Plaintiffs' argument also relies on two comments submitted in response to the prior critical habitat designation that has now been revised.  Pl. Br. at 13.  The subsequent peer review letter from Squires commenting on the 2008 proposed Rule is supportive of FWS.[4]  C.001426-1430.  In any event, the comments refer to the second step of the FWS' analysis regarding its method for locating PCE and not the first step of the FWS' analysis delineating the geographic area occupied by the species at the time of listing.

B.   FWS's Definition of the Geographic Area Occupied by the Lynx At the Time It Was Listed Is Entitled To Deference .

Plaintiffs argue that FWS' interpreted the phrase "occupied by the species, at

---

[4]Dr. McKelvey did not submit comments on the current, revised designation.

18

the time it is listed" in the statutory definition of "critical habitat" contrary to the plain meaning of the statute. Pl. Br. 12-14.  Judicial review of an agency's interpretation of a statute is governed by the familiar framework set forth in Chevron U.S.A. v. Natural Res. Def. Council, 467 U.S. 837 (1984).

As to the first step of Chevron, the ESA does not define the term "occupied." 16 U.S.C. § 1532.  This court should find, as other courts have found, that the term "occupied" is ambiguous.  Arizona Cattle Growers Ass'n v. Kempthorne, 534 F. Supp. 2d 1013, 1028 (D. Ariz. 2008); Cape Hatteras Access Pres. Alliance v. U.S. Dep't of Interior, 344 F. Supp. 2d 108, 120 (D. D.C. 2004) (CHAPA).  Because the term is undefined and ambiguous, FWS reasonably filled that gap with its own definition, and is entitled to deference.

Plaintiffs' claim that "occupied" is unambiguous hinges on a single dictionary definition of "occupied" as meaning "to take up (a place or extent in space)."   Plaintiffs' proposed definition is itself fatally ambiguous because it does not resolve questions of degree or capacity.  Does a *de minimis* amount, such as one lynx passing through an area, "occupy" an area?  Indeed, the dictionary Plaintiffs cite also supplies three other definitions for "occupy" that indicate that to occupy requires more than some minimum amount.

Plaintiffs' definition does not suitably apply to the lynx, or other highly

19

mobile species.  As the Service explained here, it was important to distinguish areas

with consistent occupancy by lynx from areas that temporarily support lynx during

dispersal movements or have only sporadic records of lynx occurrence.  74 FR

8640.  Lynx have a proclivity for long movements into unsuitable (sink) habitats.

74 FR 8640-8641; 73 FR 10872-10873; 72 FR 1188; 68 FR 40077.  For most

species, sifting the evidence of occurrence of the species is unnecessary because

endemic species do not make such long movements.  68 FR 40077. Thus, in the

context of lynx and other highly mobile species with transient individuals, FWS

may supply its own standard for "occupied by the species." Arizona Cattle

Growers, 534 F. Supp. 2d at 1029.

Moreover, the dictionary definition does not resolve a technical issue on

which FWS is entitled to deference: whether an area is to be treated as "occupied" if

the best scientific data is not exact as to whether the species occupied an area "at the

time it is listed."  Of course, there is no census of lynx on March 24, 2000, the date

FWS found the lynx to be threatened.  Thus FWS' interpretation of "occupied" is

supported by the ESA's requirements that the habitat be designated on the basis of

the "best scientific available data," which constrains the precision with which FWS

can determine the location of the lynx.   Southwest Ctr. for Biological Diversity v.

Babbitt, 215 F.3d 58 (D.C. Cir. 2000).

On the second step of <u>Chevron</u>, FWS's limitation of the geographic area occupied by the lynx to those areas with evidence they are occupied by lynx populations over a long term is reasonable.  FWS had a reasonable basis in lynx population dynamics to sort lynx occurrence records into those supporting the existence of a population in an area from those demonstrating only that an area temporarily hosted dispersing lynx.   B.3672; 68 FR 40077, 40079, 40080. Because FWS's definition of occupied has a solid footing in lynx biology and was adopted in the course of notice and comment rule-making, it is entitled to controlling weight.

    C.    <u>FWS's Method in the Rule for Locating the Areas Occupied by the Species Is Consistent with Other Decisions Regarding the Lynx</u> .

As explained above in section IV.A, FWS reviewed the available verified records of both lynx occurrence and reproduction in the course of deciding whether an area was occupied under section 3(5)(A)(i) of the ESA.  In light of that understanding, Plaintiffs' argument that FWS used conflicting interpretations in prior or parallel actions under the ESA involving the lynx lacks any factual basis. Pl. Br. 14-16.  Moreover, the analysis in the rule is easily reconciled with other places FWS has delineated the areas occupied by lynx, insofar as all turn on consideration of verified records of either lynx occurrence or reproduction.

The documents cited by Plaintiffs date from 2000 through 2008 and relate to federal land managers' efforts to comply with the ESA, and avoid jeopardy determinations or other adverse determinations by FWS in ESA Section 7 consultations. When FWS listed lynx as a threatened species in March 2000, it found the main threat to lynx were the inadequate regulatory mechanisms in National Forest and BLM land management plans and their failure to include standards for conserving lynx. 65 FR 16052. To remedy that shortcoming, the FWS and land management agencies developed a series of documents to provide special management direction on public lands for conserving lynx. 73 FR 10868.

The USFS, BLM, and FWS first developed a Lynx Conservation Assessment and Strategy (LCAS) to provide an interim approach to conserve lynx and lynx habitat on federal lands. B.3271; 73 FR 10868. The FWS and federal land managers also executed Conservation Agreements in 2000 that committed the USFS and BLM to use the LCAS in determining the effects of their actions on lynx until Forest Plans (or other management plans) were adequately amended or revised. K.000847; B.1786; B.1798; B.006; L.8243; B.001901.

In 2007, the National Forests in the Northern Rockies adopted revisions to their management plans as contemplated by the LCAS and Conservation Agreements. 74 FR 8625-8626; K.753 and K.054. National Forests in the

Southern Rockies have also completed similar revisions.  74 FR 8625-8626;

K.1226.  None of these foregoing documents used irreconcilably different

occupancy standards.

First, the criteria in the rule and Conservation Agreement for defining lynx

occupancy are not incompatible.  Both allow FWS to distinguish lynx occurrence

data as indicative of transient lynx and not occupied habitat.   L.4283.  That is

wholly consistent with FWS' criteria in the critical habitat designation

differentiating between areas with only sporadic records of lynx occurrence and

those of resident lynx populations.

In any event, the standards in the Final Rule and Conservation Agreement are

not in conflict because they are interpretations of different standards.  FWS issued

the Conservation Agreement and related documents to facilitate compliance with

section 7 of the ESA, 16 U.S.C § 1536.  ESA Section 7 jeopardy analyses may

proceed based on a broader definition of occupied habitat that includes all areas

where individual lynx occur, but which are not also critical habitat.  Gifford Pinchot

Task Force v. U.S. Fish and Wildlife Serv., 378 F.3d 1059, 1066-1067 (9th Cir.

2004).  That is to say, occupied habitat does not necessarily equate to occupied

critical habitat.  Therefore it is reasonable that for processes that involve satisfying

the requirements of Section 7, occupancy be defined with a focus toward occupancy

23

by individuals of the species.  The focus for the delimitation of critical habitat for

the lynx, for which the essential habitat was that which was able to support

populations, was appropriately on occupancy by lynx populations.

      D.    <u>FWS Declined to Designate the Southern Rockies as Critical Habitat
Based on Accepted Principles of Conservation Biology and Its
Assessment that the Area Was Not Essential to the Conservation of
Lynx</u>.

Plaintiffs next argue that FWS used a particularly stringent application of

"occupied" in deciding to not designate any critical habitat in the Southern Rockies.

Pl. Br. 16-17.  Plaintiffs also argue that Colorado should have been designated as

critical habitat.  Pl. Br. 21-24.  Again, this argument is based on a faulty

interpretation of FWS's reasoning, and a failure to contend with the evidence in the

administrative record supporting FWS.

FWS considered the Southern Rockies to be "occupied by the species at the

time it is listed" under Section 3(5)(A)(i).  73 FR 10871 ("[T]he area occupied by

the lynx in the contiguous United States is broadly delineated by the distribution of

the southern extensions of boreal forest, which occur in . . . . the Southern Rocky

Mountains (portions of Colorado, southeastern Wyoming)").   The premise of

Plaintiffs' claim is false in asserting that the FWS did not consider the Southern

Rockies occupied.

FWS decided not to designate the Southern Rockies as critical habitat based on the second step of its analysis under section 3(5)(A)(i), finding that "the marginal habitat in the Southern Rockies . . . [is] not essential to the conservation of lynx because [the areas] likely lack the quantity and spatial arrangement" of the PCE. 74 FR 8641. Although Colorado contains boreal forest landscapes, it has not been shown to contain the PCE in the quantity and spatial configuration that will sustain lynx. McKelvey et al. 2000b, B.002939; Ruediger et al. 2000, B.003336; 74 FR 8618, 8640; 68 FR 40077, 40079, 40080.

FWS explained that:

> Although Colorado's reintroduction effort is an important step toward the recovery of lynx, we do not propose habitat in the Southern Rockies for revised designation because of the current uncertainty that a self-sustaining lynx population will become established. Determination of establishment will be based on the maintenance of a stable or naturally oscillating population structure composed of breeding individuals derived from wild mating and births (rather than introduced animals). A population that has demonstrated robustness to natural fluctuations due to oscillations in prey abundance is key to determining that they are established.

73 FR 10872; 74 FR 8626. Analysis of population dynamics is particularly appropriate for Colorado because the Colorado Department of Wildlife (CDOW) has not been able to determine if lynx recruitment exceeds mortality in its reintroduced population, which would indicate that the population is growing. L.5112. In its 2008 lynx program report, CDOW maintained that it was still

25

unknown whether habitat in Colorado could support a viable lynx population.
B.4088;  L.5112.

Waiting for this sort of evidence is a reasonable approach in light of the
historical record from Colorado.  Occurrence records of lynx in Colorado are
inconsistent; no records exist between 1936 and 1969; and before CDOW began its
reintroduction effort in 1999, the last verified lynx record in Colorado occurred in
1974.  B.002940.  If a lynx population existed historically in Colorado, it failed to
rebound after the removal of trapping and predator control pressures the way
populations in more northern areas did.   B.2939-2940.  Biologists have concluded
that the population there is too small to be self sustaining or capable of naturally
rebounding to self sustaining levels; and that lynx are unlikely to persist in small,
isolated refugia of suitable habitat.   B.3336;  B.3408.

This history likely stems from the nature of the habitat in Colorado.  In
contrast to the critical habitat units, lynx occurrence in Colorado is associated with
boreal forests at higher elevations, which are "naturally highly fragmented." 72 FR
1189 and 68 FR 40090.  Landscape scale snowshoe hare densities are relatively low
in Colorado.   L.1310;  L.4311. Colorado also lacks direct connectivity to the larger
metapopulation of lynx centered in Canada, but is instead isolated by significant
distances and geographic barriers that limit emigration and immigration from

populations in the Northern Rockies, Cascades, and Canada. 68 FR 40090.

Nothing in the documents Plaintiffs cite undermines the FWS' conclusion. None of Plaintiffs' cited documents provide new or different information about the present or historical occurrence and reproduction of lynx that FWS has not already considered.[5]

In light of the foregoing record, Plaintiffs' attempt to paint the FWS' decision to not designate Colorado amounts to impermissible second-guessing.

## V.  THE AREAS PROPOSED BY PLAINTIFFS ARE NOT ESSENTIAL TO THE CONSERVATION OF THE LYNX.

Plaintiffs claim that FWS erred in excluding a number of other areas from its revised designation, and for failing to explain why the areas in question did not qualify as critical habitat.  Pl. Br. 17-21.

    A.    <u>Excluded Areas of Montana and Idaho Lack Necessary Evidence of PCE</u>.

Plaintiffs complain that FWS failed to designate areas of several national forests in Montana and Idaho.  Pl. Br. 18.  Plaintiffs' claim lacks merit because it

---

[5]Plaintiffs' discussion of the Recovery Outline (explained below in Section V.A) is particularly mistaken.  A fair reading of that report is that FWS designated the Southern Rockies as a provisional core area only because of the existence of the reintroduced population, and that its status would be changed (either elevated to a core area or relegated to a secondary area) based upon a decision whether that population proved self-sustaining.  B.003673 and I.8084-8085.

ignores the different purposes and scope of the LCAS, Conservation Agreement, and USFS plan amendments in the Northern Rockies Lynx Management Direction, on the one hand, and, on the other, FWS' criteria in the rule for identifying the PCE essential to the conservation of the species.

Plaintiffs first cite to the LCAS for the proposition that lynx have been documented throughout the Rockies. They also cite to the Northern Rockies Lynx Management Direction and other related documents that designate the Lolo, Beaverhead-Deerlodge, Bitterroot, Helena, Nez Perce and Clearwater National Forests as occupied or occupied habitat.  That is not in dispute.  But that is only the first step of the FWS' analysis for delineating critical habitat.  Under the second step of FWS's analysis, it required evidence that an area contains the PCE and that such PCE exist in the quantity and spatial arrangement to support self sustaining populations.  As explained below, the evidence from those forests (with some limited exception where areas were designated) is that they do not meet that standard, based either on the historical or present record of lynx occurrence.

Nor is the different treatment of a forest under the LCAS and related documents arbitrary.  It is accepted that "[i]n the ordinary course, any endangered or threatened species may have some habitat that is not deemed critical habitat." Gifford Pinchot Task Force, 378 F.3d at 1067.

28

The record is clear that FWS considered whether the National Forests mentioned by Plaintiffs met the criteria for critical habitat.  The Rule does not mention by name the Lolo or other National Forests identified by Plaintiffs, but FWS's methodology for delineating critical habitat and its use of the biological concepts, especially that of "secondary areas," drawn from the Lynx Recovery Outline make clear FWS considered these areas.

FWS prepared a Recovery Outline in 2005 to guide lynx recovery efforts and to inform the critical habitat designation process.  B.003670 and I.8084-8085.  The Recovery Outline reviewed current and historical lynx occurrence in order to assess "the relative importance of different geographic areas to the persistence of lynx in the contiguous United States, identifying areas as either core, provisional core, secondary, or peripheral."  73 FR 10871; B.003673.  "Core areas" were the areas with the strongest long-term evidence of the persistence of lynx populations within the contiguous United States, based on verified records of lynx occurrence over time and recent evidence of reproduction, as well as adequate boreal forest, snowshoe hare density, and snow conditions.  B.003674.  Areas classified as "secondary areas" were those with historical records of lynx presence but no record of reproduction; or areas with historical records and no recent surveys that documented the presence of lynx and/or reproduction, and doubts about the quality

29

of the habitat.   B.003675.

FWS declined to designate the secondary areas identified in the Recovery Outline as critical habitat because such areas lacked "evidence of reproducing lynx populations" or "the ability to maintain and produce lynx during population lows." 74 FR 8642.  FWS understood the limited and periodic records of lynx over time to suggest that the habitat in those areas ("snowshoe hare densities in particular") was not essential to conservation of the lynx.  Id.

Plaintiffs complaint about the Lolo is misplaced.  Portions of the Lolo are designated as critical habitat, as are portions of the Helena National Forest north of McDonald Pass and US Hwy. 12.[6]  The administrative record contains a map dated February 2007 that depicts how lynx habitat in each of those forests was categorized by the Recovery Outline (as well as lynx occupancy under the 2006 Conservation Agreement).   K.000824.

As the map shows, the remainders of the Lolo and Helena National Forests, especially the area south of McDonald Pass and U.S. Hwy 12 are mapped as secondary, not core areas in the Recovery Outline.  B.003692.  The "secondary

---

[6]Compare the map of Unit 3 in the Rule, 74 FR 8687, with the maps of the Lolo and Helena National Forests.
http://fs.usda.gov/Internet/FSE_DOCUMENTS/fsm9_021092.pdf;
http://fs.usda.gov/Internet/FSE_DOCUMENTS/fsm9_021089.pdf;
http://www.fs.fed.us/r1/helena/index_page/hnf_map.shtml

areas" in the two National Forests lacked evidence of viable lynx populations and thus lacked proof they contained the necessary quality and configuration of PCE. 74 FR 8642.

Similarly the Recovery Outline rated the Beaverhead-Deerlodge, Bitterroot, Clearwater, and Nez Perce National Forests as secondary areas.   K.000159.   These forests thus also lack the necessary evidence of resident lynx populations or the requisite PCE to qualify as critical habitat.  (Moreover, the 2006 Conservation Agreement also designated the Beaverhead-Deerlodge, Bitterroot, and Nez Perce forests as unoccupied by lynx.   K.000852.)

Plaintiffs also argue that FWS erred in not considering lynx occurrence data from the Montana Department of Fish, Wildlife and Parks (MTFWP).  As FWS made clear, it only considered "verified" lynx records, drawing its test for verified records from the scientific literature.  74 FR 8640-41 (citing McKelvey 2006, B.001056; and McKelvey 2000b, B.002916).  The article by Dr. McKelvey reports that many of the records in the MTFWP database "have varying reliability" with only a few percent of the records being verified.  B.002917-19; B.002970.  The standards in the scientific literature, and modified in the Rule, preclude reliance on unverified occurrence records.  74 FR 8640-8641;  L.2344;  B.2918. Plaintiffs do not take issue with FWS's data quality standards.  Thus their challenge to FWS's

application of those standards to the MTFWP data fails.

Likewise FWS did not ignore Plaintiffs' comments about lynx occurrence in Idaho.  The 1999 Species Conservation Assessment they cite has been superseded by more recent and comprehensive analyses of lynx occurrence that FWS considered and relied upon, including the article by Dr. McKelvey, B.2916, reconstructing the history and distribution of lynx in Idaho and which cited the Idaho Conservation Assessment, as well as the various interagency dialogues and assessments over the Clearwater and Nez Perce National Forests as part of the LCAS, 2006 Conservation Agreement, and Recovery Outline.  K.000824 (Map of occupied and unoccupied lynx habitat under the 2006 Agreement and classification under Recovery Outline).  The Idaho Species Conservation Assessment contains no verified records of lynx occurrence that were not otherwise considered by the FWS. B.003670-3692; I.8084.

Plaintiffs' claim misses the mark because regardless of the existence of lynx occurrence records in these Forests, Plaintiffs have failed to demonstrate that FWS ignored credible information that these forests are, or have ever been, occupied by viable populations of lynx or other persuasive proof they contain the requisite PCE.

VI.  THERE IS NO BASIS TO DESIGNATE UNOCCUPIED AREAS AS CRITICAL HABITAT.

Plaintiffs assert that FWS was obligated to have designated certain unoccupied areas as critical habitat.  Pl. Br. 24-28.  This claims fails because FWS had a reasonable basis to conclude that no unoccupied areas are essential for the conservation of the species.

Before FWS is able to designate any unoccupied areas as critical habitat, "it is not enough that the area's features be essential to conservation, the area itself must be essential."  <u>CHAPA</u>, 344 F. Supp. 2d at 119.  Any designation of unoccupied habitat must also comply with 50 C.F.R. § 424.12(e) that "[t]he Secretary shall designate as critical habitat areas outside the geographical area presently occupied by a species only when a designation limited to its present range would be inadequate to ensure the conservation of the species."  Plaintiffs point to no areas that are essential under FWS' criteria or that meet these standards.

Plaintiffs also argue that FWS failed to identify currently unoccupied habitat that may need protection now so it will be available for occupancy in the future as habitat shifts.  Pl. Br. 11 & 25.  Plaintiffs' logic is flawed, as discussed above, because it is premised on the unproven notion that unoccupied areas contain habitat of appropriate size and configuration or otherwise are essential to the conservation of the species.  As the Proposed and Final Rules explain in detail, FWS found that the habitat essential to conservation of the lynx was that which was demonstrably

33

sufficient to support persistent and reproducing lynx populations.   74 FR 8640.

Plaintiffs advance several ill-founded arguments as to why FWS's designation does not go far enough.   Plaintiffs assert that FWS failed to designate necessary linkage or travel corridors.  Pl. Br. 25-27.  However FWS found that linkage areas outside of the present critical habitat units were not essential to the conservation of the species (and thus not eligible) because migration between the critical habitat units and secondary areas by dispersing lynx do not materially contribute to the persistence of the DPS, but instead connect to marginal, or sink, habitats.  73 FR 10871.  Also, FWS has previously found that lynx do not face significant human-caused barriers to dispersal, weighing against any finding that protecting specific linkage areas is essential to the conservation of the species.  65 Fed.  Reg.  16079-16080.  Lynx are able to cross large expanses of unsuitable habitat to access new areas, 68 FR 40079, and no data suggests that climate changes or other factors will further affect the ability of lynx to cross unsuitable habitats such as valley floors.

## VII.  FWS CONSIDERED THE PROPER SCIENTIFIC DATA.

Plaintiffs' final argument is that FWS failed to consider certain information

they deem the best available scientific data.[7]  Pl. Br. 28As discussed above, FWS

did consider the available climate change information.  FWS considered the

MTFWP data (and reported in McKelvey 2000b, B.002916) to the extent it

consisted of verified records that met FWS' data quality standards.  The Idaho

Conservation Assessment contains no data that is not duplicative of, or superseded

by later analyses FWS did rely upon, such as the McKelvey article cited above on

the distribution of lynx.  FWS was not obligated to consider the documents

pertaining to the Southern Rockies because none contained any new evidence, not

considered elsewhere in the record, demonstrating the success of the reintroduced

lynx population.  In any event, FWS considered draft documents from the Southern

Rockies Lynx Amendment containing the same information as in the final versions

cited by Plaintiffs.  K.001226.

     Plaintiffs' assertion that FWS disregarded pre-1995 lynx data is incorrect.

One example suffices to disprove that notion.  FWS relied upon the McKelvey

article cited above.  That article reviews essentially all lynx occurrence data from

---

[7]Plaintiffs have filed exhibits that are not part of the Administrative Record.  As
discussed throughout the brief, none of these documents demonstrate that the FWS
ignored any relevant factor or failed to explain its decision.  None of the exceptions
to the general rule limiting review to the Administrative Record are applicable, and
the Court should strike the exhibits offered by Plaintiffs.  Center for Biological
Diversity v. U.S. Fish and Wildlife Serv., 450 F.3d 930, 943 (9th Cir. 2006).

the 1800s to 2000.  B.2916.  FWS used this information to locate and eliminate

from consideration those areas outside the historical range of the species.  74 FR

8640/3.  Moreover, the statutory definition of critical habitat limits the "area

occupied by the species" to that which the species occupied "at the time it was

listed."  16 U.S.C. § 1532(5)(A).  FWS explained that it used records since 1995 to

confirm occupation by lynx who could have been alive in 2000 or 2003, when FWS

issued its listing decisions.  74 FR  8640,  C.000473.  This decision was reasonable

given the limits of the available scientific data.

## CONCLUSION

Defendants request dismissal of Plaintiffs' Complaint with prejudice.

Respectfully submitted November 12, 2009.

JOHN C. CRUDEN
Acting Assistant Attorney General

/s/ *John H. Martin*
JOHN H. MARTIN, Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
1961 Stout Street, 8th Floor
Denver, CO 80294
(303) 844-1383
(303) 844-1350 (fax)
Email: john.h.martin@usdoj.gov

WILLIAM W. MERCER

36

United States Attorney for the District of Montana
MARK SMITH, Assistant United States Attorney
2929 3rd Ave. North, Suite 400
Billings, MT 59101
Tel: (406) 657-6101
Fax: (406) 657-6989

Attorneys for Federal Defendants

Of Counsel:

DANA JACOBSEN
Office of the Solicitor
United States Department of the Interior
Lakewood, CO 80215


## CERTIFICATE OF COMPLIANCE

Pursuant to L. R. 7.1(d), I certify that the attached brief is proportionately spaced, has a typeface of 14 points or more, and contains 7998 words of text.

/s/ *John H. Martin*
John H. Martin

37

i